David W. Kash, Esq., State Bar No. 013571
**KOELLER, NEBEKER, CARLSON & HALUCK, LLP**
One East Washington Street, Suite 400
Phoenix, Arizona  85004
Telephone: 602.256.0000
Facsimile:  602.256.2488
Daivd.Kash@knchlaw.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| NORTH AMERICAN SPECIALTY INSURANCE COMPANY a New Hampshire corporation,<br><br>        Plaintiff,<br><br>vs.<br><br>GNM COMPANIES, LLC, an Arizona limited liability company, SARAH MUNGUIA, MARIA E. MUNGUIA, and JUAN CARLOS GARCIA,<br><br>        Defendants. | Case No. _____<br><br><br>**COMPLAINT** |

NOW COMES Plaintiff, North American Specialty Insurance Company, a New Hampshire corporation (hereinafter "NAS Surety"), by and through its undersigned attorneys, and for its Complaint against GNM COMPANIES, LLC, an Arizona limited liability company, Sarah Munguia, Maria E. Munguia, and Juan Carlos Garcia, states as follows:

## THE PARTIES

1.      Plaintiff, NAS Surety, is a corporation organized and existing under and by virtue of the laws of the state of New Hampshire.  It maintains its principal place of business in Overland Park, Kansas.  NAS Surety is in the business of issuing surety bonds for construction, and is authorized to do so in the state of Arizona.

1

2.     GNM Companies, LLC ("GNM") is an Arizona limited liability company with its principal place of business located at 18550 West Moreland Street, Goodyear, Arizona 85338.

3.     Sarah Munguia is a resident of the state of Arizona, residing in Phoenix, Maricopa County, Arizona.

4.     Maria E. Munguia is a resident of the state of Arizona, residing in Phoenix, Maricopa County, Arizona.

5.     Juan Carlos Garcia is a resident of the state of Arizona, residing in Phoenix, Maricopa County, Arizona.

## JURISDICTION AND VENUE

6.     Pursuant to 28 U.S.C.A. § 1332, the amount in controversy exclusive of interest and costs exceeds the sum of $75,000 and, therefore, this District Court has original jurisdiction over this civil matter which involves citizens of different states.

7.     Venue is proper in this jurisdiction and the Complaint has been filed where the Defendants reside, and a substantial part of the events and omissions giving rise to the claim occurred in this district pursuant to 28 U.S.C.A. § 1391.

## BACKGROUND FACTS

8.     On or about June 19, 2017, GNM entered into that written agreement entitled Subcontract No. 60706036 ("the Subcontract") with Renaissance Residential, LLC ("Renaissance Residential") to furnish labor and materials necessary to complete the installation of drywall and non-structural metal stud framing to the building project located at 3131 N. Central Avenue, Phoenix, Arizona 85012, for the principal amount of $1,255,000. The project is commonly known as "Edison Midtown" ("the Project").

9.     As required by the terms of the Subcontract, NAS Surety, as surety and GNM, as principal, furnished to Renaissance Residential certain surety bonds, entitled Performance Bond and Payment Bond (the "Bonds") each in the penal sum of $1,255,000.

10.     On or about November 7, 2017, Renaissance Residential issued to GNM in writing its first "Default and 48-hour Cure Notice." The Default and Cure Notice advised and claimed that GNM was in default of the Subcontract. The Notice listed specific items required to cure the claimed defaults and GNM attempted to cure its defaults of the Subcontract.

11.     On or about January 30, 2018, Renaissance Residential issued its Second Default Notice to GNM, claiming that GNM failed to cure its defaults of the Subcontract.

12.     On or about February 23, 2018, Renaissance Residential issued to GNM and NAS Surety, written notice terminating GNM's Subcontract and terminating GNM from the Project.

13.     On or about February 28, 2018, Renaissance Residential advised NAS Surety in writing of sums that GNM allegedly owed its subcontractors and suppliers on the Project, including GNM's labor staffing company, (Construction Group Staffing, LLC), had recorded a lien against the Project and that it would look to NAS Surety for costs and expenses associated with Renaissance Residential completing the project, thereby putting NAS Surety on notice of its claim against the Performance Bond.

14.     On or about June 12, 2017, GNM and Sarah Munguia, Maria E. Munguia, and Juan Carlos Garcia (collectively referred to as "Indemnitors") individually and collectively executed and delivered to NAS Surety, that certain agreement entitled "General Indemnity Agreement" ("Indemnity Agreement") promising among other things, to exonerate and

indemnify NAS Surety from all loss, costs, expenses and attorneys' fees in connection with any bonds (as defined therein) for which the surety issues at their request on behalf of GNM as principal. A true and correct copy of the Indemnity Agreement is attached hereto as **Exhibit 1.**

15.     The Bonds were furnished by NAS Surety at the request of the Indemnitors to fulfill GNM's requirements under the Subcontract and in material reliance upon the representations that each of the Indemnitors made in the Indemnity Agreement, when requesting the Bonds.

16.     Pursuant to Paragraph 2 of the Indemnity Agreement entitled, "Indemnity", the Indemnitors agreed as follows:

> 2.   Indemnity:   The Indemnitors shall exonerate, hold harmless and indemnify the Surety from and against any and all Loss. For the purpose of this Agreement, Loss means any liability, loss, costs, damages, attorneys' fees, consultants' fees, and other expenses, including interest, which the Surety may sustain or incur by reason of, or in consequence of, the execution of the Bonds (or any renewals, continuations or extensions). Loss includes but is not limited to the following: (a) sums paid or liabilities incurred in the settlement of claims; (b) expenses paid or incurred in connection with the investigation of any claims; (c) sums paid in attempting to procure a release from liability; (d) expenses paid or incurred in the prosecution or defense of any suits; (e) any judgments under the performance of any Bonded contract or related obligations; and (h) expenses paid in recovering or attempting to recover losses or expenses paid or incurred. Loss expressly includes attorney fees incurred in defending claims, protecting the Surety's interests in any bankruptcy or insolvency proceeding, arranging for the Surety's performance of its obligations, evaluating, settling, and paying claims, seeking recovery under the terms of this Agreement from the Indemnitors, and pursuing the Surety's common law rights to seek recovery of losses from others, including third parties. The Indemnitors agree that their liability shall be construed as the liability of a compensated Surety, as broadly as the liability of the Surety is construed toward its oblige or other claimants.

17.     Pursuant to Paragraph 4 of the Indemnity Agreement entitled "Default," the

Indemnitors agreed as follows:

4. Default: The Indemnitors shall be in default of this Agreement in the event of any of the following: (a) the Surety receives notice of a claim, breach or default under a Bonded contract; (b) the Surety receives a declaration of default or termination under a Bonded contract; (c) any breach or default in the performance of any Bonded contract; (d) abandonment, cessation or suspension of work under any Bonded contract; (e) the failure to diligently prosecute the work under any Bonded contract; (f) the failure to pay any fringe benefit funds, other union obligations, or any federal or state taxes; (h) the failure to deposit collateral security with the Surety pursuant to Section 3 of this Agreement; or (i) the death, disappearance, conviction of a felony, imprisonment, incompetency, insolvency, or bankruptcy of any Indemnitor, or the appointment of a receiver or trustee for any Indemnitor or the property of any Indemnitor, or in the event of an assignment for the benefit of creditors of any Indemnitor, or if any action is taken by or against any Indemnitor under or by virtue of any Bankruptcy Act or Code, or should reorganization or arrangement proceedings be filed by or against any Indemnitor under said Act or Code, or any action is taken by or against any Indemnitor under the insolvency laws of any state, possession, or territory of the United States.

18.     Pursuant to Paragraph 3 of the Indemnity Agreement entitled "Collateral Security," the Indemnitors agreed as follows:

3. Collateral Security: Upon demand of the Surety, the Indemnitors shall immediately deposit with the Surety a sum of money as collateral security on the Bonds. The Surety's right to demand collateral security shall be triggered by any one of the following: (a) if it receives any notice of default, claim, or lawsuit asserting liability; (b) if it sets up a reserve to cover any investigation, demand, liability, claim asserted, suit or judgment under any of the Bonds; or (c) in the event there is a material change in the financial condition of any of the Indemnitors. The collateral security shall be equal to the liquidated amount stated in any claim or demand plus the amount that the Surety deems sufficient to cover the Surety's estimate of the costs and expenses to defend, investigate and adjust the claim or demand.   If any claim or demand does not expressly state a specific amount, then the collateral payment to the Surety shall be in an amount the Surety deems sufficient to protect it from Loss related to the investigation, adjustment, payment and defense of the claim.  Any collateral deposited as security on the Bonds shall be available in the sole discretion of the Surety

against any Bonds within the scope of this Agreement or for any other indebtedness of the Indemnitors to the Surety.   The Surety shall not be required to make any payment under the Bonds prior to demanding collateral security from the Indemnitors.

19.     Pursuant to Paragraph 9 of the Indemnity Agreement entitled "Claim Settlement, the Indemnitors agreed as follows:

> 9.   Claim Settlement:   The Surety shall have the right to decide and determine in its sole discretion whether any claim, liability, suit or judgment made or brought against the Surety or any of the Indemnitors on any Bond shall or shall not be paid, compromised, resisted, defended, tried or appealed, and the Surety's decision shall be final, binding and conclusive upon the Indemnitors.   The Surety shall have no obligation to tender its defense to any Indemnitor.   If the Surety elects not to tender its defense to any Indemnitor, then the Indemnitors shall nevertheless remain liable to the Surety for all Loss.   An itemized statement of payments made by the Surety sworn to by an officer of the Surety shall be prima facie evidence of the liability of the Indemnitors to reimburse the Surety.

20.     Pursuant to Paragraph 16 of the Indemnity Agreement entitled "Attorney in Fact," the Indemnitors agreed as follows:

> 16. Attorney in Fact:   The Indemnitors irrevocably constitute, appoint and designate the Surety or its designee as their Attorney in Fact, with the right, but not the obligation, to exercise all of the rights of the Indemnitors assigned or grated to the Surety under this Agreement.   The Indemnitors ratify and affirm all acts and actions taken by the Surety or its designee as their Attorney in Fact.

21.     Pursuant to Paragraph 22 of the Indemnity Agreement entitled "Waiver of Right to Trial by Jury," the Indemnitors agreed as follows:

> 22. Waiver of Right to Trial by Jury:   Indemnitors waive any right to trial by jury in respect to any legal proceeding arising out of this Agreement.

22.     On or about March 26, 2018, after receiving the Notices of Default and of

Termination, information that GNM owed substantial sums to its suppliers and subcontractors who are all potential claimants against the Payment Bond, and the Notice from Renaissance Residential of its claim against the Performance Bond, NAS Surety made a written demand upon the Indemnitors to place NAS Surety in funds or other acceptable collateral in the amount of $448,092.20 pursuant to the express terms of the Indemnity Agreement. Indemnitors have failed to furnish the collateral to NAS Surety.

23.     In addition to the Notice of Default, Notice of Termination and Notice of claim against the Performance Bond from Renaissance Residential, NAS Surety received written claims from vendors and subcontractors of GNM in the amount of $282,271.12 and has paid claims against the Payment Bond in the amount of $239,096.43 excluding attorneys' fees, costs, expenses and consultant fees as of the date of this Complaint. GNM agreed that these amounts, paid by NAS Surety, were owed to vendors and subcontractors. Losses, costs and expenses and attorneys' fees continue to accrue.

24.     To date, the Indemnitors have not honored their obligations to indemnify or provide collateral, or otherwise exonerate NAS Surety pursuant to their obligations under the Indemnity Agreement, in law, and in equity.

## COUNT I – REIMBURSEMENT

25.     NAS Surety incorporates by reference the allegations of paragraphs 1 through 24 above as if fully set forth herein.

26.     By reason of the Notices of Default, Notice of Termination, Payment Bond Claims and Notice of Performance Bond Claims upon NAS Surety, NAS Surety was caused to incur expenses to investigate the nature and extent of the defaults and construction relating to completing the work under the Bonds. The cost of investigation, including costs for

experts and consultants, have been incurred and those costs and expenses will continue.

27.     NAS Surety has paid losses under the Bonds, excluding attorneys' fees, as of the filing of this Complaint, in the amount of $239,096.43.

28.     By reason of the Indemnity Agreement, there is now due and owing from Indemnitors after allowing Indemnitors all just credits, deductions and set-offs, the sum of $239,096.43 together with interest therein, and costs, expenses and attorneys' fees. Indemnitors have still failed to reimburse NAS Surety for said sums or any part thereof.

## COUNT II - EXONERATION

29.     NAS Surety incorporates by reference the allegations of Paragraphs 1 through 28 above as if fully set forth herein.

30.     In addition to the losses already sustained by Surety as set forth above, NAS Surety is at risk under the Payment Bond for claims of unpaid materialmen, suppliers, subcontractors, and vendors of GNM. Further, Renaissance Residential as obligee under the Performance Bond has placed NAS Surety on notice of its claims for the cost to complete GNM's work under the Subcontract. As a consequence, NAS Surety has been obligated to establish loss reserves.

31.     By reason of the Indemnity Agreement and the principal/surety relationship existing between GNM and NAS Surety, Indemnitors are obligated as a matter of law to exonerate NAS Surety from and against any and all liability for losses of NAS Surety which may occur by reason of having executed the Performance Bond and Payment Bond as surety for GNM.

32.     NAS Surety has demanded but Indemnitors have failed and refused to exonerate NAS Surety against any claims or losses.

## COUNT III – BREACH OF GENERAL INDEMNITY AGREEMENT

33.    NAS Surety incorporates by reference the allegations of Paragraphs 1 through 32 above as though fully set forth herein.

34.    By reason of the Indemnity Agreement, and based upon the principal/surety relationship which exists between NAS Surety and GNM, the Indemnitors are obligated as a matter of law to indemnify NAS Surety from and against any and all liability for losses, costs, expenses and attorneys' fees for which NAS Surety has incurred and those which shall be incurred  by reason of having issued the Bonds as surety for GNM.

35.    To date, NAS Surety has paid losses and incurred costs, expenses, consultants' fees, investigation fees, and attorneys' fees in connection with the Bonds.  NAS Surety is exposed to liability for losses under the bonds in excess of the amounts thus far paid. Further, losses, costs, expenses, and attorneys' fees will accrue.

36.    To date, Indemnitors have not honored their obligations and refused to comply with NAS Surety's demands to indemnify NAS as surety.

37.    Indemnitors are in default of their express obligations to exonerate and indemnify NAS Surety for all losses, costs, expenses, and attorneys' fees for reason of NAS Surety having issued the Bonds on their behalf.

38.    Indemnitors are in material breach of the indemnity agreement and therefore they are liable to indemnify NAS Surety for any and all losses, costs, expenses, and attorneys' fees by reason of NAS Surety having issued the Bonds on behalf of GNM at Indemnitor's request.

## COUNT IV – SPECIFIC PERFORMANCE AND QUIA TIMET

39.     NAS Surety incorporates by reference the allegations of Paragraphs 1 through 38 as if fully set forth herein.

40.     Indemnitors expressly agree pursuant to the Indemnity Agreement to place NAS Surety in funds immediately upon demand in an amount that NAS Surety deems necessary to protect itself from any loss or potential loss.  NAS Surety, having the right to use all or part of the funds in payment, settlement, or reimbursement to itself of any loss, all pursuant to paragraph 3 of the Indemnity Agreement.

41.     On March 26, 2018, NAS Surety demanded payment of collateral in the minimum amount of $448,092.20 from the Indemnitors.

42.     To date, Indemnitors have not honored their obligations to post collateral to exonerate or indemnify NAS Surety for losses paid and have refused to comply with the Surety's request as required under the Indemnity Agreement.

43.     By reason of the Indemnity Agreement and by reason of the equitable doctrines of exoneration and Quia Timet, Indemnitors are immediately and primarily liable upon their failure to deliver payment to NAS Surety sufficient to cover losses and expenses.

44.     Indemnitors are in breach of the Indemnity Agreement to post collateral in favor of NAS Surety or to exonerate NAS Surety from loss.  Therefore, NAS Surety is entitled to specific performance of the collateral security provisions of the Indemnity Agreement requiring Indemnitors to deposit $448,092.20 at this time or otherwise to exonerate NAS Surety from all losses, costs, expenses and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, North American Specialty Insurance Company, prays for judgment against Defendants GNM Companies, LLC, Sarah Munguia, Maria E. Munguia,

and Juan Carlos Garcia, jointly and severally, as follows:

a.      A judgment and Order of specific performance against Defendants under the Indemnity Agreement that they immediately exonerate the Surety or satisfy the collateral demand of the Surety in the minimum amount of $448,092.20 plus an estimate of costs, expenses and attorneys' fees by reason of the outstanding Payment Bond and Performance Bond.

b.      Ordering Defendants to place with Surety collateral in the amount of $448,092.20 or other collateral acceptable to the Surety.

c.      Requiring Defendants pursuant to the equitable doctrine of Quia Timet to post collateral in favor of the Surety in the above amount;

d.      For judgment of indemnity and reimbursement against Defendants for the full amount of its losses, costs, expenses and attorneys' fees;

e.      For a judgment of indemnity for all costs and expenses, attorneys' fees in the prosecution of this lawsuit and;

f.      For any other and further relief as this court deems just and proper under the circumstances.

RESPECTFULLY SUBMITTED this 27th day of April, 2018.

KOELLER NEBEKER CARLSON & HALUCK, LLP

By: _____
David W. Kash
One E. Washington Street, Ste. 400
Phoenix, AZ  85004
*Attorneys for Plaintiff*